

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00118-CV

———————————————

IN THE INTEREST OF Z.J. AND D.J., CHILDREN

On Appeal from the 367th District Court
Denton County, Texas
Trial Court No. 17-8176-367

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant B.H. (Father) appeals

the termination of his parental rights to his daughter Jane[2] and in which Appellant

K.J. (Mother) appeals the termination of her parental rights to her daughter Jane and

her son John following a two-day jury trial.[3]  In two points, Father argues that it was

unconscionable for the trial court to terminate his parental rights to Jane based on his

failure to comply with his service plan because of his indigence, and he argues that the

evidence is insufficient to support the trial court's endangering-environment and

endangering-conduct findings.  Mother's court-appointed attorney filed a motion to

withdraw as counsel and an *Anders* brief in support of that motion.  Because an

unchallenged predicate ground supports the termination of Father's parental rights

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).  Unfortunately, it was not reasonably possible to dispose of this appeal within 180 days after the notice of appeal was filed due to unresolved questions about the children's status under the Indian Child Welfare Act. After abating this appeal three times to resolve those questions, the trial court signed an order on November 1, 2019, finding that the children are not Indian children. With those questions resolved, we may dispose of this appeal.

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights).  All children are referred to using aliases.

[3]John's father's parental rights were also terminated, but he did not file a notice of appeal.  He is referenced in this opinion when necessary to show the role that he played in the children's removal.

2

and because Mother's appeal is frivolous, we affirm the trial court's judgment terminating Father's parental rights to Jane and terminating Mother's parental rights to Jane and John.

## II.  Factual Background[4]

### A.  Overview

At the time of the termination trial in March 2019, Mother had been in a relationship with John's father for nine years.  Mother's relationship with Father coincided with her relationship with John's father, when they all lived in Michigan. Mother, Father, and John's father have all struggled with drug use, and Mother and the children lived with John's father in a drug house in Michigan.

In December 2016, Mother moved Jane and John to Texas in search of a better environment for her kids, but she moved into another drug house.  During a drug raid on the home in September 2017, police discovered unsanitary conditions in the home and found a gun sitting on a dresser and cocaine residue on a scale that was accessible to the children.  The Texas Department of Family and Protective Services (the Department) was called to the scene and took possession of the children.

---

[4]Because Father challenges the sufficiency of the evidence to support several of the predicate grounds and because we are required to address and detail our analysis of the endangering-environment or endangering-conduct findings, we set forth a detailed factual background.  *See generally In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (holding that due-process and due-course-of-law requirements mandate that an appellate court must address and detail its analysis for an appeal of termination of parental rights when a parent has presented an issue under Family Code Section 161.001(b)(1)(D) or (E) even when there is sufficient evidence to support another enumerated ground for termination).

Mother's parental rights to Jane and John were terminated based on the endangering environment and endangering conduct that Mother had exposed them to in addition to failing to complete her court-ordered services. Father, who lived in Michigan throughout the case and who tested positive for various illegal drugs, had his parental rights to Jane terminated based on exposing her to an endangering environment and endangering conduct, failing to complete his court-ordered services, and constructively abandoning her. Additionally, Mother's and Father's parental rights were terminated based on the jury's best-interest findings.

## B. Life in Michigan

Mother, who grew up in Michigan, started smoking marijuana at sixteen and continued smoking marijuana as she got older. Mother testified that in Michigan, people consider marijuana use to be normal because it is legal to use it for both medicinal and recreational purposes. Even though Mother knew that marijuana was a drug, she "didn't think that it was a big problem" for her. Mother believed that marijuana helped reduce her rage issues. Mother said that marijuana kept her calm and kept her out of trouble and that without it, her anger was "just unmanageable."

After giving birth to Jane in June 2014, Mother did not work outside the home. Mother said that Father never came to see Jane and that he did not do "anything pertaining to taking care of her." Mother testified that when she applied for food stamps in Michigan, Father was not providing any financial support for Jane.

4

Mother testified that when she was pregnant with John, she smoked marijuana until she was six-and-a-half months pregnant but then stopped because she wanted John to test negative for drugs when he was born in June 2015.[5] Mother mentioned that she was involved with CPS in Michigan because John tested positive for marijuana, but she did not specify when this occurred.

Mother testified that she had knowledge of John's father's criminal activity in Michigan: she knew that he smoked marijuana, hung around the wrong crowd, and dealt drugs. Mother admitted that she and her children lived with John's father in Michigan while he was dealing drugs. Mother testified that she decided to move to Texas on December 24, 2016, because "the living environment in Michigan wasn't fit for [her] to raise [her] kids there."

## C. Life after Moving to Texas

When Mother came to Texas, she moved in with John's paternal aunt and her fiancé. When Mother moved in, she knew that they were selling drugs out of the home. Mother later testified that when she had moved in, she did not know that drugs were being sold out of the house, but "months afterwards[,]. . . that is when [she] caught on that it was drugs being sold out [of] the house." Mother testified that she did not want to raise her children in a drug house but that she did not have anywhere else to go and was doing the best that she could at that time.

[5]Mother testified that even though it was legal in Michigan to smoke marijuana, it was not okay to do so around children and that CPS could "still get involved in your life if your kids test dirty during pregnancy."

Mother testified that John's father moved to Texas in February or March 2017 and that he did not immediately start selling drugs. But Mother knew that John's father was using drugs. Mother also knew that John's father was a felon and that he had a gun, but she testified that she did not know that the gun was located in the room where they slept. Mother testified that her children did not have access to the gun. Mother said that she had talked to John's father about getting rid of the gun and about abstaining from drugs but that he did not take her advice.

Mother was also using drugs. Mother said that she spent $50 per day on marijuana, which equated to twenty or twenty-five "blunts."[6] She testified that it took her at least seven blunts to get high and that once she started sobering up, she then decided whether she wanted to get high again.

### D. Mother's Parenting Skills in the Texas Drug House

Mother testified that she worked at a group home doing laundry and housekeeping for five or six months and that her children were watched by the people she was living with who were dealing cocaine and marijuana. When asked what steps she had taken to protect her children from the drugs, Mother admitted that she did not do anything to keep her children away from the cocaine and the marijuana that was in the house where they were living.

Mother testified that John's behavior and anger was worse than other two-year-olds and was different than anything she had ever seen. Mother said that when John

[6]Mother explained that a blunt is like a cigar and is larger than a joint.

6

did not get his way, he tended to throw things, hit people (without regard to their size or their age), "mess up" televisions, throw dirt in kids' hair, take stuff from kids, or bite them. When asked if she had ever tried to teach John not to hit people or how to calm down, Mother said that she had talked to him about not hitting people but that a two-year-old boy "ain't just going to take that and run with that." Mother said that she did not ever seek any professional help for John. Mother said that she had tried to handle John by giving him juice or popsicles, by letting him watch Spiderman, or by taking him to the park until he fell asleep.

Mother admitted that John was a handful for her and that she had left a thirteen- or fourteen-year-old girl in charge of him when he played outside. Mother did not think that the teenager could more effectively handle John than she could.

### E. The Drug Raid

Detective Adam Deweber with the Denton Police Department testified that he was familiar with Mother and John's father based on numerous tips in the summer of 2017 regarding drug activity at their residence. Based on the tips, Detective Deweber used a confidential informant who made multiple purchases of crack cocaine at Mother and John's father's residence. The last controlled purchase was made in September 2017, and the person who sold the drugs to the confidential informant was "Little Man," who is John's father. Detective Deweber then obtained a search warrant for the residence, and Denton Police Department's tactical team executed the search warrant around 9 a.m. on September 22, 2017.

7

After the tactical team secured the home, Detective Deweber was present for the search of the home. Detective Deweber testified that John's father had voluntarily told him that he had a nine-millimeter handgun in his possession and that it was located on the dresser next to his bed. John's father was arrested on a warrant for manufacture and delivery of under one gram of cocaine, and Mother was arrested for endangering a child. Detective Deweber explained that the endangerment charge was due to Mother's "keeping her kids in a known drug house where drugs were being used and sold that ultimately ended in a tact[ical] raid[,] which put those kids in danger." Detective Deweber testified that the children were in danger because it is "not a safe environment to have kids in a house where drugs are being used and sold."

### F. The Department Takes Possession of the Children

Shani Darthard, an investigator with the Department, testified that she was assigned to respond to the drug raid in which Mother and John's father were arrested. When Darthard arrived on the scene, six adults were handcuffed in the backyard, and four or five children were running around. The police told Darthard that they had conducted controlled purchases of drugs from the home, that the children were present during the purchases, that cocaine was accessible to the children, and that there were guns in the home.

Darthard spoke with Mother, who was crying and upset. Darthard's understanding was that Mother lived in the drug house because she did not have

8

anywhere else to stay after she and her children had moved to Texas. Mother told Darthard that she knew drugs were being sold out of the home but that she did not want to report it because she did not want to be a snitch. Mother denied knowing that there were guns in the home.

Mother told Darthard that she was using marijuana "[a]ll the time. Every day." Mother indicated to Darthard that she had an anger-management problem and said that was one of the reasons that she used marijuana daily. Mother explained that she used marijuana because it helped her with her attitude and with staying calm when her children screamed, which they did "a lot of." Mother agreed to take a drug test and stated that she would test positive for marijuana. Mother said that she did not use any other drugs. Mother signed an acknowledgement of substance abuse and admitted that she had abused substances in the children's presence.

Darthard spoke with John's father who said that he had moved to Texas in March or April 2017. He took responsibility for the situation and admitted to selling and using drugs. John's father said that his and Mother's most recent marijuana use was the day before they were arrested.

When Darthard entered the home, she encountered piles of trash, piles of clothes, holes in the wall, dirty dishes in the kitchen, flies everywhere, and "food and stuff everywhere." The police pointed out to Darthard a scale and cocaine that were on the table. Darthard also noted that the children did not have beds to sleep in. Darthard testified that the children's living conditions were deplorable, posing a safety

hazard, and agreed that the home was not a place to raise children. Darthard believed that the children were endangered by living in a home where drugs were being sold.

Darthard testified that a coworker took possession of the children on September 22, 2017. The children were taken for drug testing, and based on the results of the drug tests, the Department had further concerns.[7] The children were placed in foster care.

### G. Mother's Release from Jail

After her arrest on the day of the drug raid for two counts of child endangerment—one count based on Jane and one count based on John—Mother spent two or three days in jail. Her mother came from Michigan to bail her out. Mother also received financial help for meeting her $25,000 bond from the people she was living with.

### H. The Department Learns that John's father Is Not the Father of Jane

After the initial adversary hearing, Mother informed Darthard that Father was the father of Jane. Mother testified that Jane was two-and-a-half years old when they moved to Texas and that Father had seen her approximately twenty times and had kept her overnight a couple of times.

---

[7]Mother testified that John had tested positive for cocaine and marijuana. The record also revealed that Jane had tested positive for cocaine. Mother said that John was exposed to the fumes "[f]rom cooking up the dope" and that it was in his hair follicle. She said, "It's not like he peed it out[,] or [Jane] peed it out. It is a hair follicle." Mother agreed that she knew what was happening and that she had allowed her children to stay in the drug house.

10

When Darthard contacted Father in Michigan and told him what was going on with Jane, Father said that he had limited contact with Mother and Jane. Father told Darthard that Mother had left Michigan with Jane and that he did not know where she was.[8] Father asked how Jane was doing and said that he did not want her in foster care. Darthard described Father as "a concerned parent trying to figure out why his daughter was in foster care."

Father told Darthard that he had been smoking marijuana since he was a teenager and that he smoked marijuana every other day. Darthard testified that Father did not have a medical-marijuana card at the time of the temporary-orders hearing. Darthard testified that even with a medical-marijuana card, marijuana use is never appropriate in the presence of children. Darthard told Father that he would need to take a drug test, and he asked her what he would need to do so that he would test negative. After Father asked that question, the Department requested that Father undergo a drug test on October 13, 2017, but Father did not take the test until five

---

[8]Mother testified that Father knew she was in Texas but did not know her exact location. Moreover, Father told Darthard that he had initiated proceedings in Michigan to bring Jane back to Michigan because Mother had taken her to Texas in violation of a court order. There was evidence that the case was dismissed by agreement of the parties, but Mother said that she did not agree to dismiss the suit because she did not even know that it had been filed.

days later. Father's urinalysis was negative, but his hair-follicle test was positive for amphetamine, marijuana,[9] cocaine, and methamphetamine.

Father came to Texas for the next hearing. At trial, Darthard recapped Father's testimony from the October 20, 2017 adversary hearing, stating that he had testified that he had been arrested in 2010 for "possession of dangerous drugs" and in 2013 for possession of cocaine but that he had not been arrested "for years."[10]

## I. Parents Ordered to Work Services

Darthard testified that the trial court ordered all three parents (Mother, Father, and John's father) to work services. The services required Mother and Father to refrain from all criminal activity, any use of alcohol or illegal substances, and any misuse of prescription drugs; to attend and to participate in Narcotics Anonymous (NA)/Alcoholics Anonymous (AA) meetings; to complete a psychosocial assessment; to attend individual counseling sessions; to pay child support and medical support; to participate in visits; to complete parenting classes; to establish and maintain suitable

---

[9]Christina Ross, the conservatorship worker who took over the case in February 2018, explained that Father had tested positive in October 2017 and that he was not issued a medical-marijuana card in Michigan until March 2018. Moreover, Father could not tell Ross what condition qualified him for a medical-marijuana card.

[10]The record from the adversary hearing reflects that Father did not recall being arrested for those charges; explained that he was arrested for having one Vicodin in his possession; and claimed that the 2009 arrest "was brought back up and handled in '13, but it's the same case [involving the Vicodin pill]." Father told Darthard that he had been arrested three times on drug charges, including for possession of a controlled substance. The record also includes arrest records from Michigan, showing that Father had been arrested for aggravated felony assault in February 2017, intimidation in January 2017, and burglary in June 2014.

12

and legal employment for at least six months and continuing throughout the pendency of the case; to establish and maintain safe, stable, and appropriate housing; to participate in a drug and alcohol assessment and follow the recommendations; to complete a psychological evaluation; and to submit to random drug testing. Ross acknowledged that Father was a non-offending parent but testified that he was ordered to work services based on his drug-test results.

Darthard told Father that the Department would not pay for any of his court-ordered services in Michigan but that the Department would find out what services Michigan offered that would be compatible with his required services.[11] Darthard said that the Department would pay for Father's services if he relocated to Texas. Father said that he had recently started a new job in Michigan and that he was not interested in staying with his aunt who lived in Fort Worth in order for him to work his services in Texas because his life, which included other children, was in Michigan.

### 1. Mother's Compliance

Although Mother completed the intensive outpatient program (IOP) in June 2018, she admitted that she was still smoking two or three blunts per day three months later in September 2018. Mother agreed that every time that she bought

---

[11]Brenda Zambonino, a supervisor with the Department, testified that the Department does not have the resources to pay for services for a parent who lives out of state. Zambonino explained that when an indigent parent lives out of state, the Department works very hard to locate services in his area that are free or that have sliding-scale fees.

13

marijuana while the Department's case was pending, she was engaging in criminal activity.

Mother said that she stopped smoking marijuana in September 2018 because otherwise she would lose Jane and John. Mother said that she had been clean for four-and-a-half months at the time of the termination trial. Mother testified that she did not have a problem with marijuana and never had.

Mother testified that she was "staying with an uncle" at the time of the termination trial. Mother testified that at her uncle's one-bedroom apartment, he slept in the bedroom, and she slept in the living room.

Mother testified that she worked twenty-five hours per week at a sporting goods store at the time of the termination trial and that the rest of the day she sat at home waiting to go to work. Mother said that she paid her uncle $100 per month for rent and $0 for utilities and that she spent $100 per month on food. Mother testified that she did not have much money left over at the end of each month. Mother then said that before trial, she paid $40 to get her nails done and $190 to get her hair done. Mother admitted that she had not made any child-support or medical-support payments for the children but said that she had given things to Jane and John at the weekly visits.

Darthard testified that she had monitored two of the parent–child visits and had noted that the visits went fine, that Mother had interacted with the kids, and that

14

there were no concerns. Both Darthard and Ross said that Mother appeared to be bonded to her children and that the children appeared to be bonded to her.

Ross testified that the Department had talked to Mother and John's father about appropriate food and drink choices but that they had not changed what they brought for the children. Ross explained that there was a concern about sugary foods and drinks causing tooth decay because the children had dental problems when they came into the Department's care.[12] Despite the Department's requests not to give John sugary foods, Mother and John's father bought cookies and Air Heads from the vending machines for John. Ross further explained that "being hopped up on sugar" caused the children to have difficulties returning to daycare after the visits. Ross testified that she had seen no change in Mother's parenting abilities at the visits after she had completed parenting classes.

## 2. Father's Compliance

Ross testified that Father had complied with some of the services on his service plan. Father completed one of his services through First Step, and the records from First Step reflect that Father listed his first drug of choice as "weed" and his second drug of choice as cocaine.

Ross testified that she had called Father numerous times but had talked to him only once—in August 2018—and had given him her contact information. During the one time that Ross spoke with Father, they discussed doing his psychological

---

[12]John's front teeth required caps due to bottle rot.

evaluation with Dr. Lara Hastings, and Ross provided Father with her contact information. Ross said that Father was very hard to understand because his speech was slurred. Ross offered Father a visit with Jane, but he said that he would have to get back to Ross. Father did not ask about Jane during that phone conversation, and Father never called Ross to check on Jane. The record shows that Father visited with Jane only two times while the case was pending and that those two visits had occurred in October 2017 when he was in Texas for the adversary hearing.

The record revealed that Father did not complete several other services even though there is no cost to attend AA or NA; there is no cost for a psychosocial, a psychological evaluation, or a drug assessment if done in Texas at a provider listed in the temporary orders; and those three services could be completed in one or two days with the only cost being travel to and from Texas. Father also had not completed a free parenting class that was available in his area in Michigan.

Father did not ask for help in finding free or low-cost counseling services. Moreover, Father never told Ross that he could not afford the services that he was being asked to complete.

At the October 2017 adversary hearing, Father said that he worked in the family business and made approximately $100 per week and that he cut hair and made $70 or $80 per week. But Father did not give Ross information about his ability to provide Jane with a safe home and did not send her pay stubs showing that he could

16

provide for her. Ross testified that based on Father's social-media postings, he appeared to be doing okay financially.[13]

## J. Father's Relationship with Jane

Ross testified that Jane does not know Father as her father but instead believes that John's father is her father. Ross further testified that Father had not demonstrated any of his parental abilities and had not shown that he is able to meet Jane's physical and emotional needs.

## K. Mother's Community Supervision

Mother ultimately took a plea offer for the two counts of child endangerment that she was charged with in connection with the drug raid and received three years' deferred-adjudication community supervision. As part of her deferred-adjudication community supervision, Mother is required to undergo random drug testing every month. Mother had a positive drug test in November 2018. Mother understood that if she did not comply with her community-supervision conditions, she could go to jail and further jeopardize her children.

## L. Mother's Third Child

Mother gave birth to a son in December 2018. The hospital notes state that Mother admitted using THC during the two weeks leading up to the child's birth.

---

[13]The ad litem admitted a picture of a February 5 post from Father's Facebook page that states, "Still spending old money," and depicts a pile of money. Mother testified that when she dated Father, he had paid for things in cash and that she believed he had received the cash from selling marijuana.

17

Mother denied that she had made this admission. When the child was discharged from the hospital, CPS took possession of him.[14]

## M.  The Children's Status

Ross testified that Jane had undergone a psychological evaluation and that based on those results, she was receiving play therapy on a weekly basis. John had undergone two psychological evaluations, and based on the results, he was receiving play therapy once a week and behavioral therapy twice a week. Ross testified that behavioral therapy was working with John to help him control his emotions, to redirect his attention, and to understand "no."

## N.  Mother's Plans

Mother testified that she had changed and that her marijuana addiction was over. Mother testified that in order to stay clean, she was not going to smoke marijuana and was going to keep working and educating herself to do everything that she needed to do "to stay strong for [her] babies." Mother testified that if her parental rights were not terminated, her plan was to move to a place where her monthly rent would be $849 with all bills paid. Mother understood that her current job would not cover that amount, and so she had applied for another job that paid $12 per hour. Mother explained that she was going to save up her paychecks to afford the rent. Mother also had a tax refund that she was going to put toward the rent. But Mother said that she did not know how much daycare would cost and had

---

[14]Mother's third child is the subject of a separate case.

not looked into one. Mother testified that she loved Jane and John and that she wished she had taken a better route than the one that had led to their placement in the Department's care.

## O. The Department's Concerns, Recommendations, and Plans

Ross opined that Mother's plan for the children was not viable because (1) she was not stable and would likely have difficulty renting her own place due to prior evictions, (2) she had not shown how she would be able to provide for the children or for daycare, and (3) she had not shown how she would remain sober.

Ross's concerns about returning the children to Mother included her failure to demonstrate an ability to provide for their basic needs and suitable housing, to maintain a significant period of abstinence, to acknowledge her drug problem, and to demonstrate positive lifestyle changes since the children's removal. Ross testified that Mother had not paid child support, had not maintained safe and suitable housing, and had not successfully completed drug treatment because she had continued using drugs after she had finished the IOP. Ross said that Mother does not have a support system other than John's father, who was heading to jail in the immediate future on criminal charges. Ross opined that it was in Jane's and John's best interests for Mother's parental rights to be terminated because Mother was not able to meet their physical or basic needs, had put them in physical danger, had continued to use the controlled substance that had initially put the children in danger, and had not demonstrated that she possesses the necessary parenting abilities.

19

Ross testified that Father's criminal involvement in Michigan endangered Jane by exposing her to drugs and a lifestyle that is not appropriate for a child. Ross said that the Department believed that termination of Father's parental rights to Jane was in her best interest because he had ultimately abandoned her and had made no attempt to contact Ross, visit Jane, or work services.

Zambonino testified that it is in a child's best interest to have permanency and that the Department's plan for the children is adoption. Zambonino testified that a local home study was pending at the time of the termination trial and that if it were approved, Jane and John could be placed there if their parents' rights were terminated.

### P. Outcome

After hearing the evidence above, the jury found by clear and convincing evidence that Mother had knowingly placed or had knowingly allowed the children to remain in conditions or surroundings that had endangered their physical or emotional well-being, had engaged in conduct or had knowingly placed the children with persons who had engaged in conduct that had endangered the physical and emotional well-being of the children, and had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children who had been in the temporary managing conservatorship of the Department for not less than nine months. The jury also found that termination of the parent–child relationship between Mother and the children was in the children's best interest.

20

The jury found that Father had knowingly placed or had knowingly allowed Jane to remain in conditions or surroundings that had endangered her physical or emotional well-being, had engaged in conduct or had knowingly placed Jane with persons who had engaged in conduct that had endangered her physical and emotional well-being, had failed to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of Jane who had been in the temporary managing conservatorship of the Department for not less than nine months, and had constructively abandoned Jane. The jury additionally found that termination of the parent–child relationship between Father and Jane was in Jane's best interest.

The trial court signed an order of termination setting forth the jury's findings. Father and Mother each perfected an appeal from the trial court's judgment terminating their parental rights.

### III. Burden of Proof and Standard of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a

21

firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the parent violated a predicate ground listed in section 161.001(b)(1) and that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code

22

Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## IV. Father's Appeal

## A. Waiver Due to Unchallenged Ground

The termination judgment reflects that Father's parental rights were terminated based on four predicate grounds: endangering environment (Subsection (D)); endangering conduct (Subsection (E)); constructive abandonment (Subsection (N)); and failure to comply with a court-ordered service plan (Subsection (O)). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O). But Father's two arguments on appeal challenge only the endangering-environment ground, the endangering-conduct ground, and the failure-to-comply-with-a-service-plan ground. By failing to challenge the trial court's constructive-abandonment finding under Subsection (N), Father has waived any complaint about the sufficiency of the evidence to support that finding. *See id.* § 161.001(b) (requiring only one predicate ground to support termination); *In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019) (per curiam) (stating that "only one ground is required to terminate parental rights"); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (interpreting Section 161.001(b) as requiring only one predicate ground); *see also Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 102–03 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that failure to challenge all of the trial court's predicate-ground findings resulted in waiver).

## B. Sufficiency of Unchallenged Constructive-Abandonment Ground

Moreover, the record before us contains sufficient evidence to support the trial court's unchallenged Subsection (N) finding.[15] The Department was appointed as Jane's temporary managing conservator in October 2017 and served in that capacity through the time of the termination trial in March 2019, thus satisfying the six-month requirement of Subsection (N). With respect to the Department's efforts to return Jane to Father, there was evidence of a court-ordered service plan and evidence that Father did not comply with the service plan. *See In re N.R.T.*, 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.) (citing *In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g), and stating that implementation of a family service plan by the Department is ordinarily considered a reasonable effort to

---

[15]The Texas Family Code provides that the trial court may terminate the parent–child relationship if the trial court finds by clear and convincing evidence that the parent has

> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
>
> > (i) the [D]epartment has made reasonable efforts to return the child to the parent;
> >
> > (ii) the parent has not regularly visited or maintained significant contact with the child; and
> >
> > (iii) the parent has demonstrated an inability to provide the child with a safe environment[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(N).

return a child to her parent). The record demonstrates that Father had not visited Jane since October 2017 and had not maintained any contact, much less significant contact, with Jane during the case. Moreover, Father's positive hair-strand drug test reflects an inability to provide Jane with a safe environment. Whether viewed through the lens of legal or factual sufficiency, the record contains sufficient evidence from which the factfinder could reasonably have formed a firm conviction or belief that Father had neither regularly visited nor maintained significant contact with Jane while she was in the Department's care and that Father had not demonstrated an ability to provide a safe environment for Jane. *See In re P.R.*, 994 S.W.2d 411, 416 (Tex. App.—Fort Worth 1999, pet. dism'd w.o.j.) (holding evidence sufficient to support Subsection (N) finding because mother sporadically visited child, used drugs, and failed to comply with service plan), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 n.39 (Tex. 2002).

## C. Sufficiency of Endangering-Conduct Finding

Although only one ground under Section 161.001(b)(1) is necessary to support termination,[16] in light of the Texas Supreme Court's recent opinion in *N.G.*, we also

---

[16]*See* Tex. Fam. Code Ann. § 161.001(b)(1); *Z.M.M.*, 577 S.W.3d at 542; *A.V.*, 113 S.W.3d at 362; *see also In re G.H.*, No. 02-18-00080-CV, 2018 WL 3968788, at *10 (Tex. App.—Fort Worth Aug. 16, 2018, no pet.) (mem. op.) (overruling issues challenging other (b)(1) grounds for termination because the record contained sufficient evidence to support an unchallenged (b)(1) ground).

review the sufficiency of the evidence to support the trial court's Subsection (E) finding.  *See* 577 S.W.3d at 237.

Subsection (E) provides that parental rights may be terminated if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct [that] endangers the physical or emotional well-being of the child."  Tex. Fam. Code Ann. § 161.001(b)(1)(E).  To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health.  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam).  It is not necessary to establish that a parent intended to endanger a child to support termination under Subsection (E).  *See M.C.*, 917 S.W.2d at 270.  Nor is it necessary to establish that the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being.  *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  The endangering conduct does not have to occur in the child's presence.  *Id.* at 617.  The conduct may occur before the child's birth and either before or after the child's removal by the Department.  *Id.*  A parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being.  *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).  "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a

child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A parent's use of illegal drugs, and its effect on his or her ability to parent, may qualify as endangering conduct. *See J.O.A.*, 283 S.W.3d at 345.

Moreover, a parent's criminal conduct, convictions, or imprisonment is relevant to the question of whether he engaged in an endangering course of conduct. *In re S.R.*, 452 S.W.3d 351, 360–61 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. Routinely subjecting a child to the probability that he will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.).

The evidence showed that the results of Father's October 2017 hair-strand drug test were positive for amphetamine, cocaine, marijuana, and methamphetamine. Based on Father's drug-test results, the Department concluded that Jane could not be placed in Father's care. Additionally, Father had been arrested three times on drug charges—including for possession of a controlled substance—and for aggravated felony assault in February 2017, intimidation in January 2017, and burglary in June 2014. The conservatorship worker testified that Father's criminal involvement in Michigan endangered Jane by exposing her to drugs and a lifestyle that is not appropriate for a child. Although Father claims to be the "non-offending parent,"

during the time that Jane was in the Department's custody, he had taken no steps to contact her after the two visits in October 2017, and he had never provided any financial support. And even though Father was given a service plan, he did not complete it. *See In re U.H.R.*, No. 07-18-00318-CV, 2019 WL 81874, at *5 (Tex. App.—Amarillo Jan. 2, 2019, no pet.) (mem. op.) (stating that trial court could have considered parent's failure to complete significant requirements of her service plan as part of the endangering-conduct analysis under Subsection (E)). A reasonable factfinder could infer from Father's past drug use and his failure to work his service plan that his drug use may recur and may result in additional criminal conduct, thereby inhibiting his ability to parent and further jeopardizing Jane's future physical or emotional well-being. *See D.M.*, 58 S.W.3d at 812. Whether viewed through the lens of legal or factual sufficiency, the record contains sufficient evidence—including Father's drug use, his criminal history, his lack of contact with Jane, and his failure to complete his service plan to remedy his drug addiction—from which the factfinder could reasonably have formed a firm conviction or belief that Father's conduct endangered Jane. *See In re L.M.*, 572 S.W.3d 823, 835–36 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding evidence sufficient to support Subsection (E) finding because the record reflected, among other things, father's wholesale absence from daughter's life, multiple episodes of incarceration, and the potential for future incarceration due to drug-related activity); *cf. In re C.M.-L.G.*, No. 14-16-00921-CV, 2017 WL 1719133, at *8–10, *13 (Tex. App.—Houston [14th Dist.] May 2, 2017, pet.

28

denied) (mem. op.) (addressing (E) finding for collateral-consequences purposes, holding evidence sufficient under that ground, and affirming entire judgment). Accordingly, we overrule Father's second point.[17]

### V. Mother's Appeal

Mother's court-appointed appellate attorney filed a motion to withdraw as counsel and a brief in support of that motion, averring that after diligently reviewing the record, she believes that the appeal is frivolous. *See Anders v. California*, 386 U.S. 738, 744–45, 87 S. Ct. 1396, 1400 (1967); *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.) (reasoning that *Anders* procedures apply in noncriminal appeals when appointment of counsel is mandated by statute). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. Although given the opportunity, Mother did not file a response. The Department filed a letter stating that it would not be submitting a response to the *Anders* brief.

As the reviewing appellate court, we must independently examine the record to decide whether an attorney is correct in determining that the appeal is frivolous. *See*

---

[17]Having determined that the evidence is sufficient to support the Subsection (E) and (N) findings, we need not address the remainder of Father's second point challenging the Subsection (D) finding or his first point challenging the Subsection (O) finding. *See* Tex. R. App. P. 47.1; *see also* Tex. Fam. Code Ann. § 161.001(b)(1) (requiring only one predicate ground to support termination); *Z.M.M.*, 577 S.W.3d at 542;. *A.V.*, 113 S.W.3d at 362. Father does not challenge the best-interest finding; therefore, we do not address it.

*Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *In re K.R.C.*, 346 S.W.3d 618, 619 (Tex. App.—El Paso 2009, no pet.).

Having carefully reviewed the record and the *Anders* brief, we agree that Mother's appeal is frivolous. We find nothing in the record that might arguably support Mother's appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005). But we deny the motion to withdraw because it does not show "good cause" separate and apart from its accurate determination that there are no arguable grounds for appeal. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (order); *In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth, 2016, pets. denied).[18]

## VI. Conclusion

Having overruled the dispositive portion of Father's second point, having held that nothing in the record might arguably support Mother's appeal, and having denied Mother's court-appointed attorney's motion to withdraw, we affirm the trial court's judgment terminating Father's parental rights to Jane and Mother's parental rights to Jane and John.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: November 21, 2019

---

[18]"[A]ppointed counsel's obligations can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *P.M.*, 520 S.W.3d at 27–28.